IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JACK GUARNERI,<br><br>              Plaintiff,<br><br>     v.<br><br>BUCKEYE PIPE LINE SERVICES CO.,<br>et al.,<br><br>              Defendants. | HONORABLE JEROME B. SIMANDLE<br><br>Civil No. 14-1131 (JBS/AMD)<br><br><br>              **OPINION** |

APPEARANCES:

Robert J. Hagerty
HAGERTY & BLAND-TULL LAW LLC
714 East Main Street
Suite 2C
Moorestown, NJ 08057
     Attorneys for the Plaintiff

Vito A. Gagliardi, Jr.
PORZIO, BROMBERG & NEWMAN, P.C.
100 Southgate Parkway
Morristown, NJ 07962-1997
     Attorneys for Defendants

**SIMANDLE**, Chief Judge:

I.    **INTRODUCTION**

     Plaintiff Jack Guarneri ("Plaintiff") filed this lawsuit

against his former employer Buckeye Pipe Line Services C.,

("Defendant Buckeye") and his former supervisor Greg Engelbart,

("Defendant Engelbart") (hereafter "Defendants") alleging

violations of the New Jersey Law Against Discrimination (NJLAD)

for terminating his employment after he took disability leave

for his bipolar disorder. Plaintiff asserts five Counts of NJLAD violations: (1) that Defendant Buckeye terminated Plaintiff because he had an actual disability; (2) that Defendant Buckeye terminated Plaintiff because they perceived he had a disability; (3) that Defendant Buckeye failed to reasonably accommodate Plaintiff's disability or engage in the required interactive process; (4) that Defendant Engelbart aided and abetted Buckeye in its violations of the NJLAD; and (5) that XYZ entities and John Doe Defendants are jointly and severally liable to plaintiff for the foregoing NJLAD violations. Plaintiff seeks compensatory and punitive damages, other equitable relief, and attorney fees as a remedy.

Presently before the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 [Docket Item No. 37], arguing that Plaintiff was fired for legitimate non-discriminatory reasons. Plaintiff opposes the motion [Docket Item No. 41], to which Defendants have submitted a reply. [Docket Item 45]. With regard to Counts One and Two, Defendants assert that Plaintiff cannot establish a *prima facie* case of disability discrimination under the NJLAD because Plaintiff was not meeting his employer's expectations at the time of termination. As to Count Three, Defendants argue that Plaintiff was not able to perform the essential functions of his job and was therefore not a "qualified individual" entitled to

accommodation under the NJLAD. Finally, as to Count Four, Defendants assert that the claim against Defendant Engelbart for aiding and abetting is invalid because there was no predicate violation of the NJLAD.

The motion is decided without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth herein, the Court will grant Defendants' motion as to Counts One, Two, and Three because Plaintiff has failed to establish a *prima facie* case of unlawful discrimination under the NJLAD. The Court will further grant Defendants' motion as to Count Fours and Five because they fail as a matter of law.

## II.   BACKGROUND

### A. **New Jersey Law Against Discrimination**

The New Jersey Law Against Discrimination ("NJLAD"), was enacted in 1945 with the express purpose of ensuring civil rights, particularly in the area of employment discrimination. Viscik v. Fowler Equip. Co., Inc., 173 N.J. 1, 16 (2002). The NJLAD prohibits an employer from discriminating in the "terms, conditions, or privileges of employment" on the basis of a person's disability, N.J. Stat. Ann. § 10:5-12(a), "unless the handicap precludes the performance of employment." Failla v. City of Passaic, 146 F.3d 149, 153 (3d Cir. 1998) (citing § 10:5-4.1).

3

Although the statute prohibits any unlawful employment practice against a handicapped person, the provisions of the NJLAD do not apply if "the nature and extent of the handicap reasonably precludes the performance of the particular employment." N.J.S.A 10:5-4.1. Therefore, although the statute prohibits discriminatory employment practices, "the NJLAD acknowledges the right of the employers to manage their businesses as they see fit." Viscik v. Fowler Equipment Co., 800 A.2d 826, 833 (N.J. 2002)(citing N.J.S.A. 10:5-2.1).

B. **Summary Judgment Record**

The Court begins with an examination of the factual record in this action, beginning with Defendants' Statement of Material Facts Not in Dispute ("SMF").

1. *Plaintiff's Sales Representative Position at Buckeye*

Plaintiff was hired in April 2008 as a sales representative for petroleum distributor Farm & Home Oil. (SMF ¶ 1.) Farm & Home Oil was soon after acquired by Defendant Buckeye, and Plaintiff remained employed by Defendant Buckeye until his termination on January 23, 2012. (SMF ¶ 2.) At all points during his employment at Farm & Home and Buckeye, Defendant Engelbart was Plaintiff's direct supervisor throughout Plaintiff's employment at Buckeye. (SMF ¶ 1; Guarneri Dep., at 38:10-39:8, 40:10-13.)

Defendant Buckeye Corporation is also a petroleum distributor, which supplies wholesale fuel oil to independently owned gas stations on behalf of major brands such as Exxon Mobil or Shell. Buckeye does not own or operate any physical gas stations, nor are any stations branded with the Buckeye name. The company works as an intermediary, supplying petroleum products to local gas stations that are signed and branded with a conglomerate such as Exxon. Plaintiff's responsibility was to acquire new business and maintain relationships with these independently owned stations. (See generally Guarneri Dep., at 41:1-43:21)

Plaintiff was responsible for a large territory covering New Jersey, Delaware, and Eastern Pennsylvania. (SMF ¶ 4.) Driving long distances every day was a core job function in regards to both of Plaintiff's duties of adding new clients and maintaining existing relationships. (SMF ¶ 8; Def. Ex. 24, Engelbart Dep. 27:5-15.) Indeed, Plaintiff testified that his job required him to drive for up to six hours a day, four or five days a week. (Def Ex. 22, Guarneri Dep., at 89:5-16). Due to these travel demands, sales staff were provided with company cars and fuel cards. Plaintiff was issued a 2008 Chevrolet Equinox. (SMF ¶ 7; Def. Ex. 20 ¶ 5.)

The exact characterization of Plaintiff's job function at Buckeye is the subject of some dispute between the parties, but

ultimately, the discrepancy is non material. Defendant Engelbart testified that the "job is a sales job rather than administrative type" (Engelbart Dep., at 11:14-15.) Plaintiff himself, when asked what his job function was, responded simply that he was a "sales representative." (Guarneri Dep., at 39:9-12.)

Plaintiff started his role at Farm & Home after 20 years in various roles supervising company owned and operated stations for Sunoco. (Def. Ex. 22, Guarneri Dep., at 31:3-10.) During the early years of his employment, August 2008 to April 2010, Plaintiff was able to capitalize on contacts with local stations made while previously working at Sunoco and added eight new accounts.[1] However, after April 2010, there was a sharp and permanent drop off in Plaintiff's sales and overall performance. Plaintiff failed to bring any additional business into Buckeye from April 2010 through his termination in January 2012. (SMF ¶ 9; Guarneri Dep., at 53:17-19.)

2. *Plaintiff's Job Performance Deteriorates*

Defendant Engelbart testified that he began to be concerned with Plaintiff's job performance around the time he closed his final deal with the Margate Sunoco in April 2010, saying that he

---

[1]Sunoco changed its business model in the Southern New Jersey market early in Plaintiff's tenure at Buckeye, allowing for Plaintiff to approach stations which were previously directly supplied by Sunoco. (Engelbart Dep., at 9:5-9:18)

failed to see the "activity level [and the] prospecting ability"
that Defendant Engelbart believes are crucial to success in the
industry. (Engelbart Dep., at 5-15.) In April, 2011 Defendant
Engelbart submitted an employee review for Plaintiff, indicating
his performance "sometimes below expectations," and "need[ed]
improvement." (SMF ¶ 10.)[2]  When evaluating performance,
Defendant Engelbart testified that while he considers an array
of factors including the number of accounts the rep was
covering, how dealers view a sales rep, communications with the
rep, "primarily, it was new business" (Engelbart Dep., at 9:5-
9:18.)

After Defendant Engelbart's negative performance review,
the factual record reflects a substantial deterioration in
Plaintiff's employment performance over the subsequent months.
On April 14, 2011 Defendant Engelbart issued Plaintiff a written
warning for insubordination for an unexcused absence and for
failure to answer his voice mails.[3] (Def. Ex. 6.) On the same

---

[2] The possible performance ratings are "exceeds expectations,"
"meets expectations," "needs improvement," "sometimes below
expectations," and a fourth rating that denoted failure to meet
expectations. (Def. Ex. 24, Engelbart Dep. 40:16-41:13.) The
ratings of "needs improvement" and "sometimes below
expectations" were used interchangeably. (Def. Ex. 20 at Nos. 5-
6; Def. Ex. 24, Engelbart Dep. 40:14-41:11.)

[3] Plaintiff contends in his response to Defendants' SMF that this
is an unfair disciplinary action because Plaintiff was ill. The
Defendants stress that Plaintiff was not disciplined for falling
ill, but of a failure to communicate his absence from work to

day, Defendant Engelbart instated a new protocol for Plaintiff, requiring him to report to the office every Friday beginning April 29, 2011. (Def. Ex. 2; Engelbart Dep., at 25:16-23, 32:6-10.) This same email also instructed Plaintiff that he must sign two clients by June 30, 2011, and that he must submit a report to Defendant Engelbart by April 21, 2011 summarizing progress on that front. (Id.) Plaintiff submitted some of the requested sales call reports to Defendant Engelbart on April 27, 2011, but then again fell behind on the submission of these reports. (Def. Ex. 22, Guarneri Dep. 145:24-146:3, 152:16-22.) Despite the newly instated protocol, Plaintiff only came into the office on a single Friday, April 29, prior to taking sick leave on June 6, 2011. (Def. Ex. 20 ¶ 8.) Plaintiff testified he failed to abide by Defendant Engelbart's demands because he had fallen ill on four consecutive Fridays and then took his scheduled vacation day on the final Friday, May 27, before he took his sick leave on June 6. (SMF ¶ 24; Def. Ex. 20 ¶ 8.)

   3. *Questionable Use of Company Gas Card*

   Independent of Plaintiff's unexcused absences, sales performance, and poor communication with both customers and supervisors, Plaintiff's use of his company card for gas purchases was flagged as a potential abuse of the company's

---

his employer, whatever the reason. In any event, Plaintiff signed the disciplinary action, accepting fault. (Def. Ex. 6.)

policy. (Def. Ex. 7.)  A "huge red flag" was raised on April 29, 2011 when after an analysis of all representatives' gas charges revealed Plaintiff's charges as a "big anomaly." (Id.) Indeed, on the May invoice Plaintiff claimed a total of $2,345.93 in gas purchases, enough to fuel approximately 9,660 miles, while his car revealed driving only 4,306 miles for work. (Def. Ex. 7; Def. Ex. 8.) Human Resources felt it was "impossible given [Plaintiff's] driving habits, for his 2008 Equinox to consume this much gas." (Def. Ex. 7.) Moreover, Plaintiff's claimed gas expenses for May 2011 were more than three times those recorded for the next highest representative. (Def. Ex. 8.) In fact, a reading of all of Plaintiff's claimed fuel purchases for the entire year of 2011 (Jan 1 to April 27) revealed $1500 for mileage that was not accounted for in the course of his employment. (Def. Ex. 7.) Additionally, there was concern that Plaintiff's EZ Pass was incurring charges on weekends, which Defendant Engelbart felt constituted "another clear violation." (Id.)

Plaintiff had a prior disciplinary infraction from January 2009 for submitting a personal cigarette purchase for reimbursement on a company expense report, and was informed at that time that similar infractions could lead to immediate termination. (SMF ¶ 29; Def. Ex. 9; Def. Ex. 22; Guarneri Dep. 127:21-128:25.)

9

4. *Human Resources Notified of Plaintiff's Poor Performance*

By May 12, 2011 Defendant Engelbart had grown frustrated enough with Plaintiff's performance to send an email to Joan Gower in Buckeye's Human Resources Department, with the subject "Jack Guarneri performance issues," in which he listed perceived shortcomings in Plaintiff's job performance. (Def. Ex. 10.) Defendant Engelbart pointed to Plaintiff's failure to complete any sales since April 2010. (Id.) He also listed, in general terms, communication issues and concern over Plaintiff's apparent abuse of the company car policy. (Id.) All of these issues were present before Plaintiff began his sick leave on June 6, 2011.

In addition to bringing in no new business, Plaintiff began to neglect some of his current customers. On June 2, 2011 Defendant Engelbart sent two emails explaining Plaintiff's removal from an account after receiving complaints from the customer. (Def. Ex. 19.) In the first email, Defendant Engelbart told Plaintiff, "I have been contacted by [the customers] . . . I told them of your recent illness and vacation and promised them [Buckeye sales representative] Don Hamilton instead of you going forward. They could not reach you and I can't let them go further without assistance." (Id.)  In the second email Defendant Engelbart wrote to his own supervisors, Rodney Derstine and Joan Gower, explaining "a couple weeks back, I had

to relieve Jack from the Palisades account . . . Palisades complained that Jack wasn't available." (Id.)

  5. *Plaintiff's Illness*

  Well before starting his disability leave in June 2011, Plaintiff had experienced health issues, which forced him to miss work, sometimes for an extended amount of time. In 2008, Plaintiff had surgery related to Diverticulitis, and was out for four weeks, during which time Defendant Buckeye paid his salary for the entire course of his recovery (SMF ¶ 40; Def. Ex. 20 No. 19.) After this point, Plaintiff would periodically have flair ups of his Diverticulitis; Plaintiff informed Defendant Engelbart that he was having such an occurrence on May 13, 2011, just a few weeks before he took his extended sick leave on June 6, 2011. (Def. Ex. 11.) Defendant Engelbart responded to this leave by telling another employee that Plaintiff is "usually out for 3 days when this happens," suggesting that he was familiar with and understanding of Plaintiff's condition.[4] (Id.) This is consistent with Plaintiff's testimony that he would periodically need to take two to three days off from work, about once every three or four months. (Guarneri Dep., at 58:16-59:1.) In addition, according to a tally in a June 9, 2011 email by

_____

[4] This leave ultimately was due to Plaintiff's bipolar disorder, which also led to his extended sick leave, not the Diverticulitis as originally communicated to Defendant Engelbart.(SMF ¶ 46; Guarneri Dep., at 199:6-17.)

Defendant Engelbart, from February to May 2011, Plaintiff had also taken eleven sick days, five family leave days, and six vacation days, in addition to nine overall days of short term disability leave (Def. Ex. 8.) It is unclear from the record how many of these days, if any, were directly related to the bipolar condition which eventually led to Plaintiff's extended leave. Regardless, the record as a whole, including Plaintiff's own testimony, indicates that Defendants were generally accommodating of medical related absences leading up to his June 6 sick leave. (See, e.g., SMF ¶ 43; Guarneri Dep., at 63:21-64:4.)

6. *Plaintiff Takes Extended Leave of Absence*

Plaintiff took an extended leave of absence from June 6, 2011 to January 22, 2012. (SMF ¶ 49.) This leave was not driven by his recurring Diverticulitis, but instead by bipolar disorder. (SMF ¶ 47.) Plaintiff did not initially disclose his bipolar condition to Defendants, but instead, submitted medical documentation in support of his leave to CIGNA, the third party administrator for Buckeye's short term disability plan. (SMF ¶ 48.) Plaintiff originally intended to return to work sometime in July 2011, but submitted multiple extensions to August 22, October 3, November 7, December 6, January 16, and ultimately to January 23. (SMF ¶ 50; Def. Ex. 12; Def. Ex. 13) Each request for an extension of leave was granted, even though Plaintiff had

12

exhausted his leave under the Family and Medical Leave Act (SMF ¶ 51.) Plaintiff continued to receive his full salary until mid-October, and from there onwards was unpaid, but continued to be supported by the company's health insurance plan until his termination date. (SMF ¶ 49; Guarneri Dep., at 232:19-233:7.) Company policy for short term disability was that any absence of over three days would be paid only with approval from CIGNA. (SMF ¶ 48; Pl.'s Ex. DD.) Plaintiff's pay was therefore stopped in October, 2011 because CIGNA at that point had denied Plaintiff's claim for any further compensation. (Guarneri Dep., at 232:19-233:7.)

Shortly after Plaintiff began his sick leave, Defendant Engelbart emailed Ralph Sisco in Buckeye's Human Resources Department regarding the gas expenses for Plaintiff's company card. (Def. Ex. 8; Pl.'s Ex. D.) Mr. Sisco responded that the company car should be returned while he was out on disability. (Id.) Plaintiff was finally cleared by his physician to return to work on January 23, 2012, subject to the restrictions that he drive no more than three hours a day, and never more than one hour at a time. (SMF ¶ 57, 59; Def. Ex. 15.)

7. *Plaintiff's Termination*

Concerns about Plaintiff's job performance were raised on multiple occasions before Plaintiff began his sick leave, both directly with Plaintiff — in the form of performance reviews,

multiple insubordination write ups, and requirements that he physically show up to work on Fridays – as well as between Defendant Engelbart and Human Resources. According to Defendant Engelbart, discussions regarding Plaintiff's potential termination occurred over many months throughout 2011; however, there was no explicit decision relating to his termination until after Plaintiff began his leave on June 6. (Def. Ex. 24; Engelbart Dep., at 8:22-24, 9:3-5.)

At the start of his disability leave, several emails sent by Defendant Engelbart intimated he expected Plaintiff would return to the same sales position upon expiration of Plaintiff's disability leave. On June 17, Defendant Engelbart sent an email to Plaintiff recommending Plaintiff refrain from working "until you return." (Pl.'s Ex. E.) Also on that day, Defendant Engelbart emailed a customer informing him that Plaintiff was out on leave and that the customer should not contact Plaintiff directly "until he comes back to work in mid-July." (Pl.'s Ex. E.) Defendant Engelbart subsequently sent an email to Human Resources charting the lack of sales completed by Plaintiff and another sales representative, and stating that "upon Jack [Guarneri's] return, his lack of new business must be addressed (as well as the use of a company credit card)." (Pl.'s Ex. I.) The language in all of these emails suggests strongly that Defendant Engelbart and others employed by Defendant Buckeye

14

expected the Plaintiff to return to work at some point. Viewing this in the light most favorable to the Plaintiff, the court must conclude that there was no final or explicit decision made with regards to terminating Plaintiff before he went on leave.

The first explicit mention of an actual termination occurred December 2, 2011 in an email written by Ralph Sisco, a representative of Buckeye's Human Resources Department. (Def. Ex. 14.) The email is part of a longer thread where Plaintiff continues to delay his return date to December, then again to January 2012, after further consultation with his doctors. (Id.) Mr. Sisco responded in an email sent to another Human Resource colleague and Defendant Engelbart, stating that they "may need to move forward with termination action [of] Mr. Guarneri . . . Our original position was based upon him being on short term disability." (Def. Ex. 14.)(emphasis added.) In the same email, Mr. Sisco states that "based on performance issues I think we have the ability to terminate at will" but that he wanted to assure "reasonable accommodation & compliance with ADA so that we close the loop properly." (Id.)

Defendant Engelbart testified that he "felt [Plaintiff] should be terminated. But I also know I was just an advisor." (Engelbart Dep., at 62:13-19.) The December 2 email from Mr. Sisco supports the position that it was the Human Resources Department who had authority for and made the final decision to

15

terminate Plaintiff. (See generally Def. Ex. 14.) Defendant
Engelbart testified that his support for termination was based
primarily on Plaintiff's lack of sales, but also on Plaintiff's
poor communication, and aforementioned issues related to
Plaintiff's use of company expense accounts. (See generally,
Engelbart Dep., at 64:1-25.)

Defendants had also terminated another sales representative
who reported to Defendant Engelbart while Plaintiff was on sick
leave, also for performance issues. (Pl.'s Ex. I.) This
employee, Pat McGinley, also had deficient sales performance—he
had not made any sales in over a year—leading up to his
termination. (Id.) In an email on August 5, 2011, Defendant
Engelbart said he originally intended to implement a Performance
Improvement Plan (hereinafter "PIP") with McGinley. (Pl.'s Ex.
J.) However, by August 11, Defendant Engelbart and Joan Gower
decided that Mr. McGinley should be terminated. (Pl.'s Ex. M.)

On January 23, 2012, the day Plaintiff was scheduled to
resume work, he met at 2 pm with Joan Gower of Human Resources
and Defendant Engelbart, at which point they communicated the
decision to terminate his employment. (SMF ¶ 60, 61.) On
Plaintiff's application for Unemployment Compensation, signed by
Ms. Gower, the reason cited for termination was "Unsatisfactory
Work Performance", specifically "Lack of Sales." (Pl.'s Ex. CC.)

Ms. Gower further specified that there was no "willful misconduct" on behalf of Plaintiff. (Id.)

Plaintiff filed this Complaint on February 21, 2014 [Docket Item No. 1]. Defendants removed the case to Federal court and thereafter filed the instant motion for summary judgment, to which the Court now turns. [Docket Item No. 37].

## III. STANDARD OF REVIEW

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact and that judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, to set forth specific facts establishing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The Court must review the facts and draw all inferences in the light most favorable to the non-moving party, in this case Plaintiff Jack Guarneri. Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the factfinder, and thus at the summary

17

judgment stage credibility issues should be resolved against the moving party. Big Apple BMW v, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992); Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, "[t]he mere existence of a scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Anderson, 477 U.S. at 252. In the face of such evidence, summary judgment is still appropriate "[w]here the record . . . could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.  DISCUSSION

Plaintiff alleges four counts of disability discrimination in violation of the New Jersey Law Against Discrimination. The Court will first consider the claims against Defendant Buckeye.

### A. Discriminatory Discharge (Counts 1 and 2)

For the following reasons, Defendants are entitled to summary judgment on Counts One and Two of Plaintiff's Complaint for discrimination based on a perceived or actual disability because Plaintiff cannot make out a *prima facie* case of discrimination.  The Court therefore need not consider whether a reasonable fact finder would believe Defendants' reason for terminating Plaintiff in January 2012 was pretextual.

Disability discrimination claims under the NJLAD and the ADA are analyzed under the same framework.  Fado v. Kimber

Manufacturing, Inc., 11-4772, WL 3912852, at *5 (D.N.J., July 18, 2016); see Victor v. State, 4 A.3d 126, 145 (N.J. 2010). To state a *prima facie* cause of action for disability discrimination, the employee must allege the following: (1) the employee was handicapped; (2) the employee was otherwise qualified to perform the essential functions of the job and was performing them at a level that met the employer's expectations; (3) the employee suffered an adverse employment action because of the disability; and (4) the employer thereafter sought a similarly qualified individual for the job. Joseph v. New Jersey Transit Rail Operations Inc., 586 Fed. Appx. 890, 892 (3d Cir. 2014) (citing Victor v. State, 4 A.3d 126, 145 (N.J. 2010)); see also, Taylor v. Lincare, Inc., 15-6284, 2016 WL 3849852, at *3 (D.N.J. 2016).

In the instant case, neither party disputes that Plaintiff is disabled within the meaning of the NJLAD and ADA. Likewise, it is undisputed that Plaintiff was terminated. Plaintiff has therefore sufficiently pled the first and third elements of the prima facie case for disability discrimination in violation of the NJLAD. The parties disagree, however, on whether Plaintiff can satisfy the second prong of the *prima facie* case, namely, whether Plaintiff was performing at a level that met Buckeye's expectations as his employer. Thus, the determinative question for this summary judgment motion is whether there is a genuine

19

dispute of material fact whether Plaintiff was performing at a level that met the employer's expectations. See Gault v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998).  The Court finds that there is not.

Though the Court will read the facts in the light most favorable to Plaintiff, the Court is not required to read facts that simply do not exist. Nor is the Court permitted to move forward a disability discrimination cause of action under the NJLAD if a plaintiff cannot first establish each of the *prima facie* elements. Here, Plaintiff is unable to pass the threshold requirements for bringing a disability discrimination claim under the NJLAD because there is no factual dispute as to whether Plaintiff was meeting his employer's expectations.

Plaintiff is correct in asserting that the law applies an objective test when evaluating the "employers' legitimate expectations" rather than a subjective test. (See Pl. Opp. 33.) Thus, the Court limits its inquiry to objective job qualifications in evaluating the plaintiff's *prima facie* case, and leaves the determination of whether an employee possesses a subjective quality, such as leadership or management skills, to a later stage. Weldon v. Kraft, Inc., 896 F.2d 793 (3d Cir. 1990); see also Fowle v. C & C Cocla, 868 F.2d 59, 64-65 (3d Cir. 1989) (noting that subjective evaluations "are more susceptible of abuse and more likely to mask pretext").

Defendants are therefore required to do more than provide mere allegations that Plaintiff's performance was inadequate in order to defeat the discrimination claim at the prima facie case stage. See Cinelli v. U.S. Energy Partners, 77 F.Supp.2d 566, 576 (D.N.J. 1999) (asserting that it would be impermissible to have a principle that allowed "any employer [to] defeat a discrimination claim at the prima facie case stage simply by alleging it was dissatisfied with the plaintiff's performance").

However, in the instant case, Defendants' allegations of poor performance are corroborated by a myriad of undisputed facts that show Plaintiff *objectively* failed to perform at a level that met Defendants' expectations prior to his taking disability leave on June 6, 2011. It is undisputed that prior to his disability leave, Plaintiff failed to: (i) secure any new business for Buckeye for over thirteen months, (Def. Ex. 22, Guarneri Dep. 53:17-19.); (ii) communicate with his supervisor Defendant Engelbart, which led to insubordination write-ups[5] (Def. Ex. 6; Def. Ex. 4.); (iii) manage his existing customer accounts, forcing Defendant Engelbart to replace Plaintiff on an

---

[5] Specifically, Plaintiff failed to return two of Defendant Engelbart's phone calls and was written up for this offense on April 14, 2011 (Def. Ex. 6.) Additionally, as of April 14, 2011 Plaintiff was several weeks behind in submitting required sales reports to Defendant Engelbart (Def. Ex. 22; Guarneri Dep. 145:20-23.) On April 29, 2011 Defendant Engelbart wrote Plaintiff up for insubordination for failure to submit sales call reports on April 14, 19, 20, and 21 of 2011 (Def. Ex. 4).

account after receiving complaints from the customer (Def. Ex. 19.); and (iv) appropriately use the company's fuel card. (Def. Ex. 8.) Such a record makes clear that Plaintiff was not performing adequately in the position from which he was terminated to satisfy the *prima facie* case for disability discrimination under the NJLAD.

Plaintiff argues that "all of the 'evidence' of his performance issues should be disregarded by this Court," because, Plaintiff alleges, it is based on Defendants' subjective evaluations. This reflects a misunderstanding of the law's distinction between subjective and objective qualities. (Pl. Opp. 33.)  The Court's delineation of these two performance measures in Weldon v. Kraft, Inc., 896 F.2d 793, 799 (3d Cir. 1990) is particularly revealing.  There, the court categorized evaluations as objective when they are based on criteria in the areas of productivity, output, and efficiency.  Weldon, 896 F.2d at 299. On the other hand, the court viewed as subjective criteria evaluations based on levels of broad, general terms such as "effort" "initiative" and "sense of priorities." Id. Plaintiff further insists that Defendants' performance evaluations cannot be considered in determining whether Plaintiff was meeting Buckeye's expectations by pointing to language in Zive v. Stanley Roberts, 182 N.J. 436, 437 (2005), where the court asserted that "the quality of the employee's

22

performance does not come into play on the *prima facie* case."
This too, misconstrues the court's analysis in that case.
Objective evaluations can be measured and quantified and, as the
Weldon court illustrated, do not refer to intangible criteria,
such as the "quality" of an employee's work.

In the instant case, there were objectively clear and
measurable inadequacies in Plaintiff's performance that are not
contradicted by the evidence in the record. Plaintiff's
prolonged failure to bring in new business,[6] submit required
sales reports, return calls to supervisor Engelbart, and
maintain communication with customer accounts reflected
contemporaneous objective evidence of poor performance and were
not based on subjective evaluations. Indeed, such performance
measures can be concretely measured and tracked, and are
therefore dissimilar from subjective evaluations open to broad
interpretation, like "effort," or "initiative," that were listed
in Weldon, supra, 896 F.2d at 299.  Therefore, Buckeye's
determination that Plaintiff was not performing adequately under

---

[6] The exact characterization of Plaintiff's job function at
Buckeye is the subject of some dispute between the parties, but
ultimately the discrepancy is not material. While Plaintiff may
indeed have had ancillary responsibilities, even when drawing
all reasonable inferences in favor of Plaintiff, it would be
unreasonable to construe a job which Plaintiff repeatedly refers
to in their own opposition brief as a "sales representative" as
anything other than a sales role. (See generally Pl. Opp.)

these objective criteria is sufficient to show that Plaintiff cannot establish his prima facie case for disability discrimination under the NJLAD.

Additionally, evaluating an employee based on performance standards expected of *all* employees in a similar position suggests the use of sound, objective criteria. Weldon, supra, 896 F.2d at 299. Plaintiff's own brief shows evidence that Defendants applied uniform criteria in evaluating employees' performance. In the email to Joan Gower and Rodney Derstine on August 5, 2011 evaluating another Buckeye employee, Pat McGinley, Defendant Engelbart wrote, "Whether it's acquiring new business, building the 76 brand, or helping out with after-hours on-call transport help, he [McGinley] is failing to meet reasonable expectations." (Pl.'s Ex. T.) In this same email, Defendant Engelbart continues "The bottom line concern for me is the *lack of new business* . . . [McGinley] was rated as 'Needs Improvement' his first year." Id. (emphasis added). It is clear that Defendants emphasized sales performance as the primary criteria to evaluate its sales representatives, not just Plaintiff.

Plaintiff counters that because no official Performance Improvement Plant (PIP) was ever offered to Plaintiff prior to his termination, his treatment was not consistent with that of Mr. McGinley, who was first offered a PIP plan (Pl.'s Ex. DD.)

24

Defendants respond by stressing that their employee disciplinary procedures clarify that "The Company retains the right to administer discipline in any manner it sees fit." (Id.) Additionally, Defendant Engelbart testified that before Plaintiff had left for sick leave, even if he was not on a formal plan, it had been previously discussed. (Engelbart Dep. 70:13-20.) According to Mr. Engelbart, "I felt I was doing PIP with [Plaintiff] for a long time." Id. The evidence is also clear that Mr. Engelbart put a new protocol into place on April 14, 2011, requiring him to report to the office every Friday beginning April 29th due to Plaintiff's insubordination (Def. Ex. 2; Engelbart Dep., at 25:16-23, 32:6-10) which had been documented that same day. (Def. Ex. 6.) As noted above, Plaintiff failed to submit reports as required by the protocol and he reported only one Friday (April 29th) and missed each of the Friday office visits in May before taking sick leave on June 6. There is no evidence Plaintiff ever attempted to make up those required Friday sessions with his supervisor. Against this background of his unwillingness to comply with his supervisor's requirements for attendance improvement, Plaintiff is hard-pressed to claim that the absence of a more formal PIP somehow matters. The Court finds the lack of a more formal PIP is immaterial given Plaintiff's non-responsiveness to his

supervisor's reasonable efforts to monitor and improve his objectively poor performance.

Regardless, the NJLAD itself makes clear that nothing "shall be construed . . . to preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards." N.J. Stat. Ann. §10:5-2.1. The fact that Defendants continued to invest energy into making Plaintiff a successful employee does not negate the undisputed fact that Plaintiff was failing to objectively "perform in the position." The NJLAD specifically provides that an employer may permissibly terminate an employee for "conduct" or "any other reasonable standard[.]" N.J. Stat. Ann. §10:5-2.1. Plaintiff clearly and without dispute, failed to perform within Buckeye's reasonable expectations of his employment

Plaintiff further argues that because he still remained employed with Buckeye, he was necessarily meeting employment expectations. However, the fact that an employee holds an employment position does not mean he performed in that position to the employer's expectations. That interpretation would bely the law and common sense, essentially forcing employers to immediately terminate an employee whose performance is subpar, instead of working to improve the employee's performance. Plaintiff insists that Defendants' performance measures should be deemed irrelevant because of the court's proclamation in

26

Zive, supra, 182 N.J. at 437, that "so long as the employee shows that he has been performing in the position from which he was terminated, the second prong [of the *prima facie* case] is fulfilled." Plaintiff's interpretation of Zive is misguided and improperly equates "performing in the position" with merely holding the position. The Zive court itself rejected such a conflation, stating that "simple proof of continued employment is not enough." 182 N.J. at 455. Here, Plaintiff cannot argue he was performing adequately in a sales position when he made zero sales for an extended period. "A plaintiff's disagreement with assessment criteria . . . is not sufficient to avoid summary judgment." Maclean v. Stuart Weitzman Shoes, 863 F. sup. 2d 387, 392 (D.N.J. 2012) (citing Langley v. Merck & Co., 186 Fed. Appx. 258, 261 (3d Cir. 2006)). The fact that Plaintiff was an employee with Buckeye is not sufficient to establish that he was performing at a level that met Buckeye's performance expectations.

It is undisputed from the record that, collectively, Plaintiff's lack of new business, poor communication with clients and supervisors, and suspect use of the company gas card, fell below Buckeye's performance expectations of its sales representatives. Therefore, Plaintiff cannot establish the second prong of the *prima facie* case for disability

discrimination under the NJLAD. Defendants' motion for summary judgment on Counts One and Two are therefore granted.

### B. Failure to Accommodate (Count 3)

Summary Judgment is warranted on Count Three in the Complaint, Plaintiff's failure to accommodate claim. Although the NJLAD statute does not specifically address reasonable accommodation, "courts have uniformly held that the [NJLAD] nevertheless requires an employer to reasonably accommodate an employee's handicap." Victor v. State, 401 N.J. Super. 596, 609 (N.J. Super. A.D. 2008)(citing Tynan v. Vicinage 13 of Superior Court, 351 N.J. Super. 385, 396 (N.J. Super. A.D. 2002). Under the NJLAD, an employer must "make a reasonable accommodation to the limitations of an employee or applicant who is a person with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship." N.J. Admin. Code. Tit. 13, § 13-2.5; see also, Fitzgerald v. Shore Memorial Hosp., 92 F.Supp.3d 214, 237 (D.N.J. 2015).

"To prevail on a failure to accommodate claim, a plaintiff must first present the *prima facie* elements required in any disability discrimination claim." Fitzgerald v. Shore Memorial Hosp., supra, 92 F.Supp.3d at 237. As the Court has already determined, Plaintiff cannot establish a *prima facie case* for disability discrimination because he cannot show that he met his employer's expectations. Because Plaintiff cannot pass this

threshold requirement, he is barred from proving that Defendants failed to accommodate his disability. Consequently, Defendants are entitled to summary judgment on this claim and Plaintiff's Count Three, alleging failure to accommodate, is hereby dismissed.

### C. Aiding and Abetting (Count 4)

Defendant Engelbart is entitled to summary judgment on Count Four of Plaintiff's Complaint, alleging Defendant Engelbart aided and abetted Defendant Buckeye in violating the NJLAD, because Plaintiff failed to raise a genuine issue of material fact on this claim. A person aids and abets a violation of the NJLAD when he knowingly gives substantial assistance or encouragement to unlawful discriminatory conduct. Failla v. City of Passaic, 146 F.3d 149, 158 (3d Cir. 1998) (following the Restatement (Second) of Torts §876(b)). The New Jersey Supreme Court has interpreted "aid" and "abet" consistently with the Restatement (Second) of Torts 876(b)). See Tarr v. Ciasulli, 181 N.J. 70 (2004). Under that standard, an employee is liable as an aider or abettor if a plaintiff can show that "(1) the party whom the defendant aids perform[s] a wrongful act that causes an injury; (2) the defendant [is] generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; [and] (3) the defendant knowingly and substantially assist[s] the principal violation." Id. at 84.

Following this standard, the Court concludes that Plaintiff has failed to present evidence that Defendant Engelbart aided and abetted Defendant Buckeye in alleged disability discrimination against Plaintiff. First, as previously stated, Plaintiff cannot establish sufficient support to show Defendants discriminated against Plaintiff or performed any unlawful act. Additionally, there is zero evidence in the record to support the narrative that Defendant Engelbart perceived a violation of Plaintiff's rights, and knowingly took steps to further that violation. (See Cicchetti v. Morris County Sheriff's Office, 194 N.J. 563, 594 (2008) (stating that aiding and abetting requires "active and purposeful conduct"). Plaintiff has provided some evidence that Defendant Engelbart assisted in Plaintiff's termination, but Plaintiff cannot show Defendant Engelbart had actual knowledge of or involvement in illegal or tortious activity.[7]

While the Court has carefully reviewed the factual record in granting Defendants' summary judgment on Count Four, Plaintiff's failure to respond to Defendants' motion on this Count corroborates the Court's finding that there is no genuine issue of material fact on this claim. "Although entitled to the

---

[7] Defendant Engelbart testified that he "felt [Plaintiff] should be terminated. But I also know that I was just an advisor." (Engelbart Dep., at 62:13–19.)

benefit of all justifiable inferences from the evidence, the nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings." Taylor v. Virtua Health, Inc., 05-4271, 2007 WL 1827094, at *3 (D.N.J. 2007). Defendants' Motion for Summary Judgment on Count Four will be granted.

### D. Claims Against XYZ Entities and J. Doe Defendants

The Court grants summary judgment on Count Five of Plaintiff's Complaint because Plaintiff has not identified the John Doe Defendants and no named Defendants remain in the action. There is nothing before the Court or on the docket to suggest that Plaintiff has identified and named these individuals, and it follows that there is no indication that they were ever served with the Complaint or Amended Complaint. The time for service under Fed. R. Civ. P. 4(m) has long expired,[8] and Plaintiff has not moved to extend time for service, nor has he demonstrated good cause for failing to effectuate service within the specified time limit. See McCurdy v. Am. Bd. of Plastic Surgery, 157 F.3d 191, 196 (3d Cir. 1998). Moreover, the Court does not have the ability to direct service on these

---

[8] Plaintiff's Complaint was filed on January 23, 2014. The 90-day period of Rule 4(m), Fed. R. Civ. P., expired on, April 22, 2014.

unnamed Defendants because Plaintiff has failed to specifically identify them and has not moved for discovery to uncover their names. Accordingly, the Court will exercise its discretion and dismiss these unnamed defendants. See, e.g., Macklin v. County of Camden, No. 15-7641, 2016 WL 3545520, at *6 (D.N.J. June 28, 2016)(dismissing John Doe defendants because plaintiff neither served nor sought discovery on the identity of the individuals within the time period specified under Fed. R. Civ. P. 4(m), and failed to show good cause for noncompliance); Catlett v. N.J. State Police, No. 12-153, 2015 WL 9272877, at *6 (D.N.J. Dec. 18, 2015) (Simandle, J.) (dismissing John Doe defendants on same grounds).

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in full. Plaintiff's claims are hereby dismissed. An appropriate Order follows.


**September 7, 2016**       **s/ Jerome B. Simandle**
  Date                          JEROME B. SIMANDLE
                                 Chief U.S. District Judge